**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CANYON FERRY ROAD BAPTIST
CHURCH OF EAST HELENA, INC.;
BERTHOLD GOTLIEB STUMBERG, III,
"B.G.",
            *Plaintiffs-Appellants,*

                  v.

DENNIS UNSWORTH, Montana
Commissioner of Political
Practices, in his official and
individual capacity,
            *Defendant-Appellee.*

No. 06-35883

D.C. No.
CV-04-00024-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Chief District Judge, Presiding

Argued and Submitted
August 4, 2008—Seattle, Washington

Filed February 25, 2009

Before: Harry Pregerson, William C. Canby, Jr., and
John T. Noonan, Circuit Judges.

Opinion by Judge Canby;
Concurrence by Judge Noonan

2167

**COUNSEL**

Dale Schowengerdt, Alliance Defense Fund, Scottsdale, Arizona, for the plaintiffs-appellants.

Anthony Johnstone, Deputy State Attorney General, Office of the Montana Attorney General, Helena, Montana, for the defendant-appellee.

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia; Jonathan R. Motl, Reynolds, Motl & Sherwood, Helena, Montana; for Amici Curiae.

## OPINION

CANBY, Circuit Judge:

Canyon Ferry Road Baptist Church challenges certain provisions of Montana's campaign finance law requiring reporting and disclosure of campaign contributions or expenditures. The Church challenges the statutory provisions both facially and as applied to its activities of *de minimis* economic effect in support of a 2004 state ballot initiative. Following an adverse administrative decision by the Montana Commissioner of Political Practices, the Church brought this action in federal court, claiming that the Commissioner's decision violated its First Amendment and due process rights and seeking declaratory relief as well as nominal damages. On cross-motions for summary judgment, the district court upheld the Montana law against all challenges. We reverse.

## BACKGROUND

Canyon Ferry Road Baptist Church, an incorporated religious institution located in East Helena, Montana, generally adheres to the Christian doctrines of the Southern Baptist Convention. Among these doctrines is the belief that marriage may exist only between one man and one woman.

In the spring of 2004, the Church's Pastor, Berthold Gotlieb Stumberg, III, became interested in possible ways in

which the Church could assist in an effort to collect signatures to place Constitutional Initiative No. 96 ("CI-96") on the Montana state ballot the following November. If placed on the ballot and approved by Montana's voters, CI-96 would amend the Montana state constitution to define marriage as a union between one man and one woman. For the signatures to be effective, the signed petition forms had to be turned over to the sponsoring organization and then submitted to appropriate election officials no later than June 18, 2004.

In May 2004, Terri Paske, a member of the Church who campaigned for CI-96 in partnership with Jeff Laszloffy,[1] printed out a template CI-96 petition from the Montana Family Foundation website and made less than fifty copies of the petition on the Church's copy machine, using her own paper. With Stumberg's approval, Paske placed roughly twenty copies of the petition in the Church's foyer.

At about the same time, Stumberg began making arrangements for the Church's congregation to view an audio-visual simulcast entitled *Battle for Marriage*. The *Battle for Marriage* simulcast included presentations by several prominent religious leaders on the topic of marriage. Stumberg planned to have it screened in connection with a regularly scheduled Sunday evening service on May 23, 2004. There is no evidence in the record that the Church was charged any fees for access to the *Battle for Marriage* simulcast.

The Church advertised the upcoming screening, which was open to the public, through unpaid public service announcements aired by five radio stations. Although the Church often incorporates simulcasts in its services and all of the Church's services are open to the public, the *Battle for Marriage* was the only simulcast for which the Church secured public service announcements on the radio. In addition, the Church

---

[1]Laszloffy was a sponsor of CI-96 and the president of its campaign committee, Montana Family Foundation.

photocopied and circulated flyers publicizing the event, the
template for which had been provided to the Church by the
organizers of the simulcast. The flyers were placed in the
Church's bulletin and Stumberg encouraged members of the
congregation to take the flyers to their workplace and "let
people see it." The flyers did not mention CI-96.

On May 23, 2004, ninety-three people attended the *Battle
for Marriage* event, well above the average attendance for a
typical Sunday evening service at the Church. The congrega-
tion and members of the public watched the *Battle for Mar-
riage* simulcast. In addition to televised presentations by
several Christian ministers, the simulcast discussed a pro-
posed amendment to the United States Constitution that
would establish a definition of marriage as being solely
between one man and one woman. It did not expressly sup-
port or oppose any Montana ballot issue or candidate for pub-
lic office.

After the *Battle for Marriage* program ended, Stumberg
spoke to those in attendance about CI-96. He said that the
threat to marriage also existed in Montana, and that the con-
gregation should resist it in prayer and by signing the CI-96
petition. Stumberg told the audience that they "need[ed] to
sign" the CI-96 petition and that he would "encourage[ ]
everyone to sign it. This is one of the ways that we take a
stand for righteousness." He then indicated that CI-96 peti-
tions were available in the foyer near the Church's exits. The
following Sunday, Stumberg circulated the CI-96 petition for
signature among the attendees at each of the Church's three
services that day during announcement time. The petitions
remained available in the Church's foyer for signature until
they were submitted on June 13, 2004.

By June 13, 2004, the petitions made available in the
Church's foyer contained ninety-eight valid signatures of resi-
dents of Lewis and Clark County.[2] Ninety-two of these came

---

[2]Similar forms were also available in the foyer for signature by resi-
dents of two other counties. The record does not disclose how many signa-

from members of the Church. Paske had the forms notarized and mailed copies of the signed petitions to the designated county officials for filing and to Laszloffy. The sponsors of CI-96 ultimately obtained the requisite number of signatures and the initiative was placed on the November ballot. It was passed by the voters of Montana by a margin 295,070 Yes votes to 148,263 No votes (66.5% to 33.5%).

On May 26, 2004, an advocacy group called "Montanans for Families and Fairness" filed a Campaign Finance and Practices Complaint against the Church. The complaint alleged that the Church, by its "expenditures" in connection with the May 23 event to support CI-96, had created an "incidental political committee" within the meaning of Montana's campaign finance laws but had not filed the required disclosure forms. After completing an investigation, the state Commission of Political Practices ("Commission") issued an administrative decision. It found that

> it is clear that when the Church and pastor Stumberg chose to engage in activities supporting the effort to place CI-96 on the ballot, the Church became an incidental political committee under Montana law, with corresponding reporting obligations. Use of the Church's facilities to obtain signatures on CI-96 petitions, along with Pastor Stumberg's encouragement of persons to sign the CI-96 petitions during regularly scheduled Church services, obviously had value to the campaign in support of CI-96. Pastor Stumberg was not acting as a volunteer when he engaged in the activities supporting CI-96, since

---

tures were collected from residents of those counties, but suggests that the great majority of the signatures came from residents of Lewis and Clark County.

those activities occurred in the Church building and during regularly scheduled Church services.[3]

The Church and Stumberg (collectively, the "Church") brought this action under 42 U.S.C. § 1983 for declaratory relief and nominal damages. The Church challenges the Commissioner's application of Montana's disclosure and reporting provisions. It argues that, as interpreted by the Commission, Montana's disclosure and reporting provisions are impermissibly vague, in violation of the Due Process Clause of the Fourteenth Amendment. It also argues that the provisions are overbroad and violate the Church's First Amendment rights of free speech, association, and free exercise of religion. The parties filed cross-motions for summary judgment and the district court dismissed the complaint, rejecting all the claims asserted by the Church. The Church appeals. We have jurisdiction under 28 U.S.C. § 1291.

## STATUTORY BACKGROUND

Since the 1970s, Montana has required "political committees" to disclose expenditures and contributions made toward candidate elections and ballot issues and to comply with additional reporting requirements. In relevant part, the key term "political committee" is defined as "a combination of two or more individuals or a person other than an individual who makes a contribution or expenditure . . . to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue . . . ." Mont. Code. Ann. § 13-1-101(20).[4] Mon-

---

[3]Unpaid services provided to candidates or political committees by individuals volunteering their time are excluded from the statutory definitions of "contribution" and "expenditure." Mont. Code Ann. § 13-1-101(7)(b)(i) and (11)(b)(i).

[4]Individuals have no duty to report directly to the State the contributions and expenditures they make in connection with candidate elections or ballot initiatives. Their contributions to political committees or individual candidates, however, are reported by the recipients as part of their reporting and disclosure obligations. Mont. Code. Ann. § 13-37-229(4). If an individual's aggregate contributions to a given candidate or committee are greater than $35, the recipient must report the contributor's full name, mailing address, occupation, and employer, if any. *Id.* § 13-37-229(2).

tana's Administrative Rules refine this definition by differentiating among three different types of "political committees": "principal campaign committees," "independent committees," and "incidental committees." Mont. Admin. R. 44.10.327(1). The Commission found the Church to be an "incidental committee," which is defined as "a political committee that is not specifically organized or maintained for the primary purpose of influencing elections but that may incidentally become a political committee by making a contribution or expenditure to support or oppose a candidate and/or issue."[5] Mont. Admin. R. 44.10.327(2)(c).

The designation of a group or entity as an "incidental committee," then, turns on the definition of the terms "contribution" and "expenditure"; if two or more persons make a contribution or expenditure for or against a candidate or ballot proposition, a committee has been formed. A "contribution" is defined as

> an advance, gift, loan, conveyance, deposit, payment, or distribution of money or anything of value to influence an election; a transfer of funds between political committees [or] the payment by a person other than a candidate or political committee of compensation for the personal services of another person that are rendered to a candidate or political committee.

Mont. Code. Ann. § 13-1-101 (7)(a)(i)-(ii).[6] Similarly, an "expenditure" is defined as

---

[5]"Issue" is defined by the statute as:

a proposal submitted to the people at an election for their approval or rejection, including but not limited to initiatives, referenda, proposed constitutional amendments, recall questions, school levy questions, bond issue questions, or a ballot question.

§ 13-1-101(17).

[6]The statute carves out from this definition of "contribution" the time devoted by volunteers working on a campaign as well as any lodging and

a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value made for the purpose of influencing the results of an election.

§ 13-1-101(11)(a). The term "anything of value"—which affects the scope of "expenditures" and "contributions" alike —is defined as "any goods that have a certain utility to the recipient that is real and that is ordinarily not given away free but is purchased." § 13-1-101(3). Montana's Administrative Rules elaborate on the scope of these key provisions. The terms "expenditures" and "contributions" encompass "in-kind" expenditures and contributions, which refer—with some exceptions irrelevant in this case—to "the furnishing of services, property, or rights without charge or at a charge which is less than fair market value to a person, candidate, or political committee for the purpose of supporting or opposing any person, candidate, ballot issue or political committee . . . ." Mont. Admin. R. 44.10.323(2).

Different types of "political committees" are subject to different reporting and disclosure obligations. As an "incidental committee," the Church is required to report all transactions, regardless of the amount involved, that 1) qualify as "expenditures" or "contributions" under the statute and regulations and 2) are made by the committee "in connection with a statewide issue." Mont. Admin. R. 44.10.411(4). In addition, an incidental committee must also report every contribution that it receives if the contribution is "earmarked."[7] Mont. Admin. R. 44.10.411(5). Other donations, such as those that the

---

meals provided by individuals in their private residences, news or editorial coverage in the media and an organization's communications to its membership. § 13-1-101 (7)(b).

[7]A contribution is "earmarked" if it is "made with the direction, express or implied, that all or part of it be transferred to or expended on behalf of a specified candidate, ballot issue, or petition for nomination." Mont. Admin. R. 44.10.519(1).

Church ordinarily receives to support its regular operations, are not subject to any reporting or disclosure requirements.

Generally, an incidental committee is subject to periodic filings which must be completed every quarter and at various times surrounding an election. Mont. Code. Ann. § 13-37-226(6); Mont. Admin. R. 44.10.411. If the incidental committee makes a one-time political expenditure, however, it may file a combined initial and closing report that terminates its status.[8] In either case, the initial registration as an "incidental committee" must occur within five days of making a political expenditure. § 13-37-201.

If a political committee fails to file a required report within the required time periods, the Commissioner of Political Practices may issue an order of noncompliance. § 13-37-121(2). Upon issuance of an order of noncompliance, a political committee must submit the necessary information within five or ten days, depending on whether the order is issued during an election period or not, respectively. § 13-37-121(3)-(4). Failure to do so may result in the initiation of civil or criminal actions. *Id.* In the past ten years, the Commissioner has settled or dismissed all investigations it has commenced under these provisions without filing a civil action, and the record discloses no criminal prosecutions.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.

---

[8]Unlike incidental committees, principal and independent committees are required to provide more extensive disclosure, including information on (1) loans, (2) interest, rebates, refunds and fundraisers, (3) political action committee contributions, (4) political party committee contributions, (5) incidental committee contributions, (6) individual contributions above $35, (7) petty cash expenditures, (8) independent expenditures and (9) other debts outstanding. (http://politicalpractices.mt.gov/content/pdf/5cfp/2008_Complete_C-6_form_1.pdf).

2001) (en banc). "Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## DISCUSSION

The Church argues that it cannot constitutionally be subjected to the disclosure and reporting requirements applicable to "incidental political committees" under Montana law on the sole basis of its activities of *de minimis* economic effect in connection with the *Battle for Marriage* event and related petition—signing efforts in support of CI-96. It argues, *inter alia*, that, as applied to its activities, the Montana statute is impermissibly vague. We agree in part with the Church's vagueness claim and hold that, as applied to (1) the placement of the petition in its foyer and (2) Stumberg's exhortation to sign the petition in support of CI-96 during a regularly scheduled Sunday service, the Commission's interpretation of "in-kind expenditures" is unconstitutionally vague.

We also agree that the designation of the Church as an "incidental committee" because of its one-time, in-kind "expenditures" of *de minimis* economic effect violates the Church's First Amendment free speech rights.[9]

## Vagueness

[1] The thrust of the Church's vagueness challenge is that the definition of in-kind expenditures and contributions[10]

---

[9]Our disposition of the vagueness and free speech issues makes it unnecessary for us to address the Church's additional challenges based on First Amendment rights of association and free exercise of religion.

[10]Although the Commission expressly rejected the contention that the Church's activities amounted to "coordinated expenditures," it is not entirely clear whether the Commission considered the Church's activities

under Montana law "fails to provide people of ordinary intelligence a reasonable opportunity to understand" whether their activities require disclosure under the statute. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Montana law defines an "in-kind expenditure" as "the furnishing of services, property, or rights without charge or at a charge which is less than fair market value to a person, candidate, or political committee for the purpose of supporting or opposing any person, candidate, ballot issue or political committee." Mont. Admin. R. 44.10.323(2)[11]; *see also* Mont. Admin. R. 44.10.321(2)(a) (providing a similar definition of in-kind contributions).

On their face, the Montana regulations are precise enough. The hallmark of an "in-kind" participation in a campaign finance effort is the provision of a good or service either "without charge" or with a charge below its fair market value. For example, extended provision of vehicles or rental space without charge are common types of in-kind political expenditures or donations that clearly fall within this definition. We have no doubt, therefore, that the Montana regulation poses no vagueness problem in the " 'vast majority of its intended applications.' " *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)). We accordingly reject the Church's claim that the regulation is void for vagueness on its face. *See id.*

---

in-kind expenditures or in-kind contributions. This distinction does not affect our analysis, however, because, in this case, we are concerned only with disclosure, not substantive restrictions on campaign finance. To avoid repetitions, we assume that the Commission considered the Church's activities in-kind expenditures.

We also note that the Commission does not appear to have relied on the regulation extending the reach of "expenditures" to "[e]xpenses incurred in support of or opposition to the drafting, printing, distribution and collection of signatures for any petition for nomination or a statewide ballot issue." Mont. Admin. R. 44.10.323(1)(c).

[11]This definition is quite similar to the comparable definition of in-kind contributions in federal regulations. *See* 11 C.F.R. § 100.52(d).

**[2]** The application of the regulation to the Church's activities in this case presents a different question, however. Unlike the federal disclosure law, 2 U.S.C. §§ 431(4)(A), 434(b)(3)(A), the Montana disclosure and reporting requirements are triggered by *any* in-kind expenditure or contribution, no matter how negligible its value. *See* Mont. Admin. R. 44.10.411(4). The absence of a minimum value threshold substantially affects the analysis of the disclosure requirement's vagueness. As the commercial value of a certain activity in support of a candidate or ballot issue approaches zero, it becomes increasingly difficult for the party engaging in the activity to know whether his or her activity could possibly be considered a "service." This case presents a classic illustration of the problem.

The Church's activities relied on by the Commission included (1) allowing Paske to photocopy a CI-96 petition form on the Church's copy machine, with her own paper; (2) placing the CI-96 petitions in the Church's foyer; and (3) Stumberg's exhortation to sign the CI-96 petition during a regularly scheduled sermon on May 23, 2004. The Commission apparently found that all three of these activities constituted "in-kind expenditures." We conclude that, as applied to the second and third activities, the definition of "in-kind expenditure" is impermissibly vague.

**[3]** In extending the reach of "in-kind expenditures" to cover Stumberg's endorsement and the Church's acquiescence in making the petition available in its foyer, the Commission apparently concluded that these activities amounted to "services." With respect to Stumberg's exhortation, the theory adopted by the Commission is that any otherwise qualifying political activity, if performed within the scope of one's employment, amounts to a "service." The same theory appears to have driven the Commission's conclusion with respect to the Church's decision to let Paske "use its facilities" to display the petition.

**[4]** When a group's "services" are accompanied by either a detriment to the provider of the service—say, an out-of-pocket expense or the preclusion of other activities—or an ascertainable market value, notice that a service has been provided is inherent in the provision of the service itself. But when the activity in question brings no detriment to the putative incidental committee *and* carries no market value, the notice fails. In that case, a group engaging in a certain activity for the purpose of supporting a candidate or ballot issue is left with no objective guidance as to whether it has provided a "service"; the best it can do is rest on its members' subjective intent[12] and guess what effect their conduct will have on the intended beneficiary. Under the Commission's interpretation of "in-kind expenditures," an activity that might not appear to be an expenditure becomes one if the activity turns out to have been of value to the beneficiary, even though that value may not become apparent until after the reporting date has passed. Such uncertainty does not "provide people of ordinary intelligence a reasonable opportunity to understand" whether their activities require disclosure under the statute. *Hill*, 530 U.S. at 732. We therefore conclude that Montana's in-kind expenditures provision may not be applied to the Church's conduct when that conduct neither causes an economic detriment to the Church nor carries an ascertainable market value.

**[5]** The Church's placement of the petition in its foyer and Stumberg's endorsement of CI-96 do not bear the objective indicia that we have just specified. There is no indication that the Church suffered any detriment from either placing a few sheets of paper in its foyer or having its pastor engage in a brief discussion of CI-96. Nor do we accept the State's char-

---

[12]An expenditure or contribution requires an intent "to influence an election." Mont. Code. Ann. § 13-1-101(7)(a)(i). In addition, for two or more people to be subjected to "incidental political committee" reporting requirements, their contribution or expenditure must be made "to support or oppose a candidate and/or [ballot] issue." Mont. Admin. R. 44.10.327(2)(c).

acterization of the entire *Battle for Marriage* event and May 23, 2004 service as a rally in support of the signature-gathering effort. The event took place in conjunction with a regularly scheduled service, the discussion of CI-96 took up but a fraction of the program, and the Church paid no fee to secure access to the simulcast. Finally, the Church would have incurred the same maintenance expenses whether Stumberg had discussed and endorsed CI-96 or not. We therefore conclude that the Church incurred no expense or otherwise cognizable detriment in connection with these two activities.

Moreover, while we do not doubt that the sponsors of CI-96 eventually derived some value from the activities in question, nothing in the record establishes that either the display of the petition in the foyer of the Church or the endorsement of the Church's pastor, without more, carry any objective market value. Certainly, the Church was not in the business of selling endorsements or renting out its foyer to those wishing to advertise therein; nor does the record disclose any market to which the sponsors of CI-96 could have turned to secure comparable assistance in exchange for a fee.

**[6]** We therefore conclude that, because the display of the petition in the Church's foyer and Stumberg's endorsement did not bring about a detriment to the Church or carry ascertainable market value, the Church had no way to know *ex ante* that, by engaging in these two activities, it was actually providing a "service" that would later be considered an in-kind expenditure in support of CI-96. As applied to these services, the Montana regulations defining in-kind contributions are unconstitutionally vague.

**[7]** In contrast, we conclude that, as applied to the Church's acquiescence with Paske's use of its copy machine to photocopy the template CI-96 petition, Montana's definition of in-kind expenditure poses is not unconstitutionally vague. Unlike Stumberg's endorsement or the placement of the petition in the Church's foyer, the provision of a copy machine meets the

objective criteria that we have set forth above. It is clear that
the Church incurred *some*, albeit *de minimis*, expense in the
wear and tear of its equipment; it is also clear that Paske
would have been charged if she had secured the same photo-
copying services on the open market. It is not unreasonable to
charge the Church with knowledge that it was providing a ser-
vice of some market value. Accordingly, we conclude that the
regulations defining in-kind contribution are not impermiss-
ibly vague as applied to the copying service. That conclusion
does not end our constitutional inquiry, however, for the
Church also challenges the regulations on First Amendment
free speech grounds.

### Free Speech Challenge

The Church challenges the financial and organizational dis-
closures that a group of two or more people must make upon
becoming an "incidental committee." The Church argues that,
as applied to its activities, the disclosure requirements
imposed under Montana law violate its First Amendment
rights by imposing an unjustified burden on its constitution-
ally protected election-related "speech." We conclude that, as
applied to the one-time in-kind *de minimis* expenditures
involved in this case, the state reporting requirements violate
the Church's First Amendment rights.

### A.   Degree of Scrutiny

The degree of scrutiny that we must apply to Montana's
disclosure requirements with respect to the Church's activities
is somewhat unclear, due in part to arguably inconsistent pre-
cedent and in part to the uncertain status of the Church as a
multi-purpose advocacy organization.[13] *See Alaska Right To*

---

[13]The Church presents most, but not necessarily all of the salient fea-
tures of a multipurpose public advocacy organization that was held to be
entitled to challenge restrictions on campaign expenditures under a strict
scrutiny standard in *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238

*Life Comm. v. Miles*, 441 F.3d 773, 787-88 (9th Cir. 2006) (questioning whether, in the wake of *McConnell v. FEC*, 540 U.S. 93 (2003), disclosure requirements should be subjected to strict scrutiny in an as-applied challenge brought by a multi-purpose organization and assuming without deciding that strict scrutiny applied). *But see Cal. Pro-Life Council, Inc. v. Randolph* ("*Cal. Pro-Life II*"), 507 F.3d 1172, 1178 (9th Cir. 2007) (applying strict scrutiny to a multi-purpose organization after *McConnell*, albeit relying in part on the "law of the case" doctrine). We do not need to decide this complex question to adjudicate this case, however. We will assume without deciding that "heightened"—not "strict"—scrutiny applies to the Church's challenge.[14] In other words, we ask whether the Montana disclosure requirement has a " 'relevant correlation' or 'substantial relation,' " *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (footnote omitted), to an "important state interest," *McConnell*, 540 U.S. at 195. Even under this standard, the state disclosure requirement, as applied to the Church's *de minimis* in-kind expenditures, runs afoul of the First Amendment.

## B.    Informational Interest

The State articulates only one interest in defense of its disclosure scheme: providing its citizenry with information about the constituencies supporting and opposing ballot issues. We are satisfied that this interest is "important."

---

(1986). Like Massachusetts Citizens for Life, the Church is a non-profit organization that cannot engage in business activities, has no shareholders or affiliated persons with a claim to assets or earnings and was not established by a corporation or business entity. *See id.* at 264. Unlike Massachusetts Citizens for Life, however, it was not "formed for the express purpose of promoting political ideas." *Id.*

[14]In *Alaska Right to Life Comm.*, we similarly found it unnecessary to resolve the uncertainties over the standard of review, and applied the standard most favorable to the non-prevailing party on appeal. *Alaska Right to Life Comm.*, 441 F.3d at 788.

[8] In *Buckley* and again in *McConnell*, the Supreme Court identified three "important" interests that justified campaign finance disclosure in the context of elections for federal office: "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196 (citing *Buckley*, 424 U.S. at 67-68). Of these, the second interest—deterring corruption or the appearance thereof—falls out of the picture in the context of ballot initiatives, for such referenda present no risk of *quid pro quo*. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . is not present in a popular vote on a public issue."); *Mont. Chamber of Commerce v. Argenbright*, 226 F.3d 1049, 1056 (9th Cir. 2000) (same). In addition, the state disclosure requirements at issue in this case are evidently not substantially related to the third important interest: aid in enforcing "more substantive electioneering *restrictions*," for no substantive limits on contributions or expenditures apply in the context of Montana's ballot issues. *McConnell*, 540 U.S. at 196 (emphasis added); *see Mont. Chamber of Commerce*, 226 F.3d at 1057-58 (striking down Montana's ban on corporate expenditures and contributions in ballot issues under Mont. Code Ann. § 13-35-227).

[9] With respect to the remaining interest, we have little trouble concluding that Montana's informational interest is generally "important" in the context of Montana's statewide ballot issues. Indeed, we recently observed that California had produced evidence sufficient to qualify its informational interest in disclosure of contributions to a ballot issue as "compelling." *Cal. Pro-Life II*, 507 F.3d at 1179-80 nn.8&9. Although the evidence put forth by Montana in this case is not as formidable as that provided by California in *Cal. Pro-Life II*,[15]

---

[15]The evidence presented to the district court in *Cal. Pro-Life II* included a survey gauging public sentiment about the ballot initiative process, expert testimony by a professor of political science and an affidavit by a public official. 507 F.3d at 1179 n.8.

CANYON FERRY ROAD v. UNSWORTH            2187

Montana's case is convincing and its burden lighter.[16] *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). We have already held that, as a general matter, mandating disclosure of the financiers of a ballot initiative may prevent "the wolf from masquerading in sheep's clothing." *Cal. Pro-Life Council, Inc. v. Getman* ("*Cal. Pro-Life I*"), 328 F.3d 1088, 1106 n.24 (9th Cir. 2003). "[B]y knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation." *Id.* at 1106. We also reject the suggestion that, because Montana's election system appears to be open and highly functional, the need for disclosure is somehow decreased. We are not willing to count Montanans' current confidence in their state ballot process *against* the State's informational interest. *See Mont. Chamber of Commerce,* 28 F. Supp. 2d 593, 598-99 (D. Mont. 1998), *aff'd* 226 F.3d 1049, 1056 (9th Cir. 2000) ("The ballot issue process in Montana is healthy and not corrupt."). We conclude that, in the context of ballot issues in which this case arises, Montana's interest in keeping its citizens well informed with respect to the groups financially supporting and opposing voter initiatives remains "important" today.

It is essential to keep in mind, however, just what information the State has determined that the public needs. The information to be disclosed is the identity of persons *financially* supporting or opposing a candidate or ballot proposition. *See, e.g.*, Mont. Admin. Rule 44.10.411(4); *see also Buckley*, 424 U.S. at 78 (Congress "wished to promote full disclosure of campaign-oriented spending to insure both the reality and appearance of purity and openness of the federal election process."). The disclosure requirements are not designed to

---

[16]*Cal. Pro-Life II,* which addressed a challenge brought by a multipurpose entity, applied strict scrutiny. 507 F.3d at 1178.

advise the public generally what groups may be in favor of, or opposed to, a particular candidate or ballot issue; they are designed to inform the public what groups have demonstrated an interest in the passage or defeat of a candidate or ballot issue by their *contributions* or *expenditures* directed to that result. This point regarding the nature of the informational interest becomes especially important when we examine whether the Montana regulations as applied to the Church are substantially related to that interest.

## C.  Substantial Relation

We next assess the "fit" between Montana's disclosure requirements and the State's informational interest. We must decide whether the informational value, as we have just described it, to the public derived from disclosure of the Church's *de minimis* in-kind expenditures justifies the burden imposed by the reporting requirement. We note at the outset that the question is one of degree, not kind, for it is well established that, in the ordinary case, a state informational interest is sufficient to justify the mandatory reporting of expenditures and contributions in the context of ballot initiatives. *See, e.g., Alaska Right To Life Comm.*, 441 F.3d at 789-92 (upholding disclosure requirements under *strict scrutiny*); *Cal. Pro-Life II*, F.3d at 1189 (endorsing disclosure requirements in the context of ballot initiatives on the authority of *Mass. Citizens for Life*, 479 U.S. at 262).

In *Buckley*, the Supreme Court reviewed a federal reporting scheme requiring record-keeping of contributions above $10 and disclosure of contributions above $100. *Buckley*, 424 U.S. at 82-85. It noted that, in setting thresholds for disclosure of campaign finance activities, "[t]he line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion." *Id.* at 83. It concluded that, on the "bare record" before the Court, "the limits designated [we]re [not] wholly without rationality," even though there was "little in the legislative history to indicate that Congress

focused carefully on the appropriate level at which to require recording and disclosure." *Id.* (footnote omitted). Because the federal statute did *not* require disclosure of contributions below $100, the Court expressly reserved judgment on whether "information concerning gifts [between $10 and $100] can be made available to the public without trespassing impermissibly on First Amendment rights." *Id.* at 84.

**[10]** The question, then, becomes whether Montana's "zero dollar" threshold for disclosure is "wholly without rationality." *Id.* at 83. On the one hand, we recognize the principle that "signals are transmitted . . . not only by a contribution's size but also by the contributor's identity." *Vote Choice v. DiStefano*, 4 F.3d 26, 32 (1st Cir. 1993). On the other hand, we cannot say that the informational value derived by the citizenry is the same across expenditures of all sizes. As we have explained, in the ballot issue context, the relevant informational goal is to inform voters as to "who backs or opposes a given initiative" financially, so that the voters "will have a pretty good idea of who stands to benefit from the legislation." *Cal. Pro-Life I*, 328 F.3d at 1106. As a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy. In the present case, the voters could learn little about the *financial* backing of the ballot proposition by gaining access to information about the Church's activities of minimal economic effect.

Meanwhile, the burden of reporting remains constant even though the size of the in-kind expenditure decreases to a negligible level. The Commissioner of Political Practices has issued two forms applicable to incidental political committees: Form C-2, "Statement of Organization"; and Form C-4, the "Incidental Political Committee Finance Report." Form C-2 requires a statement of purpose, the name and address of

the committee, its designated treasurer and other officers, and the bank holding the committee's depository account. Form C-4 goes further and requires a list of earmarked contributions received by the committee—including the donors' names, addresses, occupations, employers, and amounts contributed for contributions greater than $35—and expenditures made by the committee—including amount, purpose, and name and address of payee. While not exceedingly onerous, such requirements undoubtedly constitute a burden, even in the case of one-time expenditures, which may be reported in a combined initial and closing report.

**[11]** We conclude that, if the Supreme Court's "rationality" test for threshold disclosure levels has any force at all, there must be a level below which mandatory disclosure of campaign expenditures by "incidental committees" runs afoul of the First Amendment. It may very well be that such a level is not susceptible to dollar estimation or that all monetary contributions convey sufficiently valuable information about the supporters of an initiative to justify the burden of disclosure. But if we are to give *any* effect to *Buckley*'s "rationality" test, at some point enough must be enough. Applying the disclosure provisions to the Church's *de minimis in-kind* expenditures lies beyond that point. Expending a few moments of a pastor's time, or a marginal additional space in the Church for petitions, is so lacking in economic substance that we have already held that requiring their reporting creates fatal problems of unconstitutional vagueness. Similarly, the value of public knowledge that the Church permitted a single like-minded person to use its copy machine on a single occasion to make a few dozen copies on her own paper—as the Church did in this case—does not justify the burden imposed by Montana's disclosure requirements.[17]

---

[17]The State emphasizes that the retail nature of Montana politics requires a low reporting threshold. True as that proposition may be, it does not justify the burden of "incidental committee" reporting imposed as a consequence of the extremely minimal in-kind expenditures attributed to the Church in this case.

**[12]** We conclude that, by applying its disclosure provisions to the Church's *de minimis* in-kind contributions in the context of a state ballot initiative, the Commission violated the Church's First Amendment rights. We limit our holding to this formulation. In this case, we are not concerned with—and express no view about—the constitutionality of Montana's disclosure requirements in the context of candidate elections or as applied to monetary contributions of any size. We also do not purport to establish a level above *de minimis* at which a disclosure requirement for in-kind expenditures for ballot issues passes constitutional muster. The fixing of any such level is for the Montana authorities in the first instance. We are satisfied, however, that the application of Montana's disclosure requirements to the Church because of its *de minimis* activities in this case impermissibly infringes on the Church's free speech rights.

## CONCLUSION

**[13]** For the foregoing reasons, we conclude that Montana's disclosure and reporting requirements are unconstitutional as applied to the Church's *de minimis* activities in connection with CI-96. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

NOONAN, Circuit Judge, concurring:

I gladly join the opinion of the court and write here to address an issue briefed by both parties and not of inconsequential importance: the constitutionality of MCA § 13-1-101 et seq. and the regulations thereunder in the light of the Free Exercise Clause of the First Amendment.

Current constitutional doctrine permits "a neutral, generally applicable law" to operate even though its incidental effect is

an impact on the exercise of religion. *Employment Division v. Smith*, 494 U.S. 872, 890 (1990). In contrast, a statute that is not both of general applicability and neutral toward a religious practice is constitutional only if justified by a compelling government interest which the law is narrowly tailored to serve. *Church of Lukumi Babalu Aye., Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Is the Montana statute neutral and generally applicable? Is it narrowly tailored to serve a compelling government interest?

The first question is answered by inspection of the statute. A large class of activities is exempted from its operation. A reportable contribution does not include "the cost of any bona fide news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine or other periodical publication of general circulation." MCA § 13-1-101(7)(b)(2). The media are free to promote political opinions without registering as independent political committees and without disclosing the identity of those owning the facilities used to promote the opinions. The most likely sources of potent political input into an election are removed from the statute's scope. The generality of the statute is destroyed. The neutrality of the statute is preserved as to the media while all religious expressions on a ballot measure are swept within its requirements. The disparity between the treatment of the media and the treatment of churches is great and gross.

It might be countered, "Of course the press doesn't fall within the statute. Its freedom is protected by the First Amendment." But if it is obvious that the freedom of the press would be infringed by the statute's requirements, is it not equally obvious that the free exercise of religion is burdened by them? To carve out an exemption for one kind of speech — that employed by the professional media — and deny the exemption to speech by a church is to achieve neither neutrality nor general applicability.

The burden imposed by the statute on a church speaking its mind is not trivial, especially in the case of a church, such as the Canyon Ferry Road Baptist Church of East Helena, Inc., a Southern Baptist entity possessed of its own identity and governance. The church consists of 400 members; it has a pastor and a youth pastor and a part-time secretary. To comply with the statute, the pastor would first have to understand what the statute requires in the framework of Montana election law. This understanding is not materially assisted by the regulations issued by the Commissioner of Political Practices, whose statutory duty is "the control of political practices." As with many specialized statutes and the regulations issued under them the advice of a good lawyer would be essential not to fall afoul of the statute's criminal penalties. Reading and understanding the statute with the help of counsel is the first burden imposed.

The second burden on the church is to convert itself for the time being into an independent political committee, registered with the state, equipped with a campaign treasurer, a depository, and a new name. Now minted as an IPC, this entity must file a form with the Commissioner of Political Practices and with the county within five days of making a political expenditure. The IPC must also file a form with the Commissioner reporting contributions. It is easy to suppose these reporting and filing requirements are slight. They may be so for a large enterprise. They are care-demanding and time-consuming for a small congregational church. In addition, the statute seeks the names and the employers of the contributors of small amounts of money. For business or social reasons, a small contributor may wish not to be publicly identified with one side of a controversial public issue. The required report strips this contributor of his chosen anonymity. This effect, which discourages contributors, is an additional burden on the church.

As for narrow tailoring to a compelling government interest, the Commissioner of Political Practices contrasts the bad

old days of domination by the Anaconda Company with the present healthy state of Montana politics, said to be due to the disclosure law. The Commissioner does not even attempt to show how the disclosure law has this beneficent effect.

The disclosure law leads to the disclosure of the names of the makers of small contributions, said by the Commissioner to be a major factor in Montana elections. How do the names of small contributors affect anyone else's vote? Does any voter exclaim, "Hank Jones gave $76 to this cause. I must be against it!" Small contributors are not the Anaconda Company.

The Commissioner also argues that the report of in-kind contributions by the church is helpful to the voters. But if the church's corporate efforts are effective at all, both the supporters and opponents of a ballot measure will know where the church stands and judge accordingly. They don't need to consult what is filed with the Commissioner.

What has happened here is that a small congregation has been put to trouble and expense in order to exercise its right to speak on an issue seen by it to be of vital religious significance. One lesson of history is that small incursions on freedom are to be resisted lest they grow greater.

I noted earlier the exemptions of the press from the disclosure statute. An unregulated, unregistered press is important to our democracy. So are unregulated unregistered churches. Churches have played an important — no, an essential — part in the democratic life of the United States. On two of the greatest issues ever to confront our country, churches led the way and churchmen conducted crusades.

The first decided whether this nation should be half free and half slave. Not only the slaveowners but many persons of equable temperament and moderate judgment hesitated to dislodge an institution that had existed in America for over 200

years, protected by the constitution and the courts. Church-
men — principally Congregationalists and Unitarians — took
up the cause of universal freedom and over bitter opposition
and armed rebellion assured the triumph of what they put for-
ward as a Christian cause.

A century later, when the fruits of freedom had been imper-
fectly realized and African-Americans still suffered griev-
ously from discriminatory laws and practices, Christian
churchmen again led the way in what has been aptly described
by one of its leaders, the Reverend Joseph Lowery, as "the
black church coming alive." Its opening moments occurred in
1955 in Montgomery, Alabama when Rosa Parks refused to
move to the back of the bus and was arrested for violating a
municipal ordinance segregating bus seating by race. Martin
Luther King, Jr., a local pastor, emerged as the leader of a
boycott of the buses by blacks. At each critical stage King
spoke in the language of religion. At the first mass meeting
he quoted the words of Jesus as reported in the Gospels, told
the crowd that their protest should be "with Christian love,"
and gave as advice, "Let your conscience be your guide." The
crowd sang "Onward Christian Soldiers." When his house
was bombed, King cooled the crowd saying, "What we are
doing is just. God is with us." For King, conscience was a
trumpet. *The Lustre of Our Country* (1998) 256.

Is it necessary to evoke these historic struggles and the
great constitutional benefits won for the country by its
churches in order to decide this case of petty bureaucratic
harassment? It is necessary. The memory of the memorable
battles grows cold. The liberals who applaud their outcomes
and live in their light forget the motivation that drove the
champions of freedom. They approve religious intervention in
the political process selectively: it's great when it's on their
side. In a secular age, Freedom of Speech is more talismanic
than Freedom of Religion. But the latter is the first freedom
in our Bill of Rights. It is in terms of this first freedom that
this case should be decided.